**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HARRISON DIVISION**

**CARROLL ELECTRIC**
**COOPERATIVE CORPORATION**                                           **PLAINTIFF**

**v.**                              **CASE NO. 3:16-cv-3034**

**SOUTHWESTERN BELL TELEPHONE**
**COMPANY, INC. d/b/a AT&T; and**
**JOHN DOES 1-22**                                                    **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court is a Motion to Dismiss, Abstain, or in the Alternative,

Stay (Doc. 23) filed by Defendant Southwestern Bell Telephone Company, Inc. d/b/a

AT&T ("SWBT").[1] The Motion has been fully briefed and is ripe for decision. For the

reasons stated herein, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.      BACKGROUND**

According to its Complaint, Carroll Electric Cooperative Corporation ("Carroll

Electric") is an entity originally organized in 1938 pursuant to the Rural Electrification

Act. It is in the business of supplying electricity to the Northwest Arkansas and

Southwest Missouri communities, and to that end it has established and maintained

hundreds of miles of wood poles—colloquially known as telephone poles or utility poles.

SWBT is one of the nation's largest telecommunications companies. On December 8,

1958, Carroll Electric and SWBT entered into a written agreement entitled "General

Agreement Joint Use of Wood Poles" (the "JUA"). In relevant part, the JUA establishes

---

[1] According to Defendant, the Complaint inadvertently lists its name incorrectly. It should be listed as "Southwestern Bell Telephone Company d/b/a AT&T Arkansas," which is "a Delaware company with its principal place of business in Dallas, Texas." (Doc. 25, p. 1).

terms and conditions related to the parties' abilities to attach electric and telephone lines, respectively, to each other's poles. Article XX of the JUA provides for possible termination of the agreement after 25 years, or "thereafter upon the giving of written notice to the other party not less than three years prior to the date of termination." (Doc. 20-1, p. 9).

On February 25, 2011, Carroll Electric gave written notice of termination to SWBT providing for the termination of the JUA effective March 1, 2014. (Doc. 20-2). The notice instructs SWBT to "make necessary arrangements to have all attachments removed from Carroll Electric Cooperative Corporation facilities prior to this date." *Id.* Nonetheless, and for reasons that will become apparent in this Memorandum Opinion, SWBT's telephone lines remain attached to Carroll Electric's poles to this day.

Carroll Electric filed a Complaint in the Circuit Court of Carroll County, Arkansas, and SWBT removed the suit to this Court on March 22, 2016. Carroll Electric filed a four-count Amended Complaint (Doc. 22) on June 20, 2016. Count I alleges that the continued presence of SWBT's attachments on Carroll Electric's poles constitutes a trespass. Count II asks the Court to grant Carroll Electric injunctive relief to remedy that alleged trespass. Count III argues that SWBT breached its contract with Carroll Electric by (a) installing facilities on Carroll Electric's poles in violation of the National Electrical Safety Code; (b) attaching to Carroll Electric's poles without its permission; (c) paying Carroll Electric an annual rental amount below the specifications of the JUA; and (d) failing to remove its facilities from Carroll Electric's poles after the termination of the JUA. Count IV seeks punitive damages for SWBT's conduct.

SWBT filed an Answer (Doc. 25) to the Amended Complaint on July 7, 2016, generally denying the claims against it. It also filed the instant Motion to Dismiss, Abstain, or in the Alternative, Stay (Doc. 23) on June 16, 2016. The Motion argues that the Court lacks subject-matter jurisdiction because the Arkansas Public Services Commission ("APSC") has primary and exclusive jurisdiction over Carroll Electric's claims. Alternatively, the Motion suggests that this Court should abstain from deciding this case under the *Burford* abstention doctrine. Again alternatively, the Motion asks the Court to stay these proceedings until the APSC's Amended Pole-Attachment Rules are adopted into law. Carroll Electric filed its Response (Doc. 26) on July 13, 2016, contending that this Court has subject-matter jurisdiction and that *Burford* abstention would be improper. SWBT then filed a Reply (Doc. 28) on July 18, 2016. Finally, on August 24, 2016, Carroll Electric submitted Supplemental Authority (Doc. 29) in the form of an August 19, 2016 Rehearing Order from the APSC, and a case out of the Court of Appeals of Texas, Fort Worth Division.

## II.    DISCUSSION

### A.    Establishing and Exercising Jurisdiction

SWBT frames its Motion as one for dismissal due to lack of subject-matter jurisdiction, or in the alternative, abstention under the *Burford* doctrine. *See* Doc. 23, ¶ 6. The Court believes that SWBT's reference to subject-matter jurisdiction is a misnomer, as it cannot be seriously argued that this Court lacks subject-matter jurisdiction.

"It is a verity that federal courts are courts of limited jurisdiction." *Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A.*, 551 F.3d 812, 816 (8th Cir. 2009).

Specifically, federal courts' jurisdiction is limited to what is permitted by the Constitution and then conferred by Congress. In this case, the Court undoubtedly has subject-matter jurisdiction by virtue of Article III, Section 2, Clause 1 of the Constitution, and 28 U.S.C. §§ 1332 and 1441. Article III grants federal courts the power to hear controversies "between Citizens of different States." In accordance with this constitutional grant of power, Congress conferred the district courts with original jurisdiction "of all civil actions," between citizens of different states, "where the matter in controversy exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a)(1). Congress also authorized the district courts to hear "any civil action brought in a State court of which the district courts of the United States have original jurisdiction," once the action is properly removed by a defendant. 28 U.S.C. § 1441(a).

The Court does not understand SWBT to be questioning whether these requirements for diversity jurisdiction have been met. It is uncontested that SWBT is not a citizen of Arkansas, Carroll Electric is a citizen of Arkansas, and more than $75,000 is in controversy. Insofar as the Court is mistaken, and SWBT does intend to challenge the Court's subject-matter jurisdiction, its motion to that effect is denied. However, the Court believes SWBT's Motion is best understood as a request for this Court to decline to exercise its otherwise undisputed jurisdiction.

Federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). "This duty is not, however, absolute. . . . [F]ederal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest." *Id.* (quotation omitted). One

such circumstance is captured by the *Burford* abstention doctrine, named for the case in which it was first recognized by the Supreme Court. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Pursuant to *Burford* abstention:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (quotations omitted). In simpler terms, "a federal court should abstain when the action before it involves matters of state law best left to the state alone." *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 417 (8th Cir. 1985). The doctrine applies only where the relief being sought is equitable or otherwise discretionary in nature; it does not allow federal courts to *dismiss* cases where the relief requested is non-discretionary damages. *See Quackenbush*, 517 U.S. at 728-31. "*Burford* might support a federal court's decision to *postpone* adjudication of a damages action," however, by entering a stay. *Id.* at 730 (second emphasis added).

## B. Arkansas' Statutory and Regulatory Scheme for Pole Attachments

To decide whether dismissal or a stay might be appropriate under the *Burford* doctrine, the Court must first review Arkansas' statutory and regulatory scheme for pole attachments. In light of this scheme, it must then evaluate whether the case presents difficult questions of state law bearing on policy problems of public import, or whether the Court's adjudication would disrupt Arkansas' regulatory efforts. This analysis begins with determining the scope of the APSC's authority to resolve pole-attachment disputes.

### 1.      The APSC's Jurisdiction to Resolve Disputes Involving Pole Attachments

When an appropriate party brings a complaint to the APSC, it has the authority "to conduct investigations and public hearings, to mandate monetary refunds and billing credits, or to order appropriate prospective relief as authorized or required by law, rule, regulation, or order." Ark. Code Ann. § 23-3-119(d). The APSC's jurisdiction in such disputes "is primary and shall be exhausted before a court of law or equity may assume jurisdiction." *Id.* However, the APSC "shall not have the authority to order payment of damages or to adjudicate disputes in which the right asserted is a private right found in the common law of contracts, torts, or property." *Id.* Section 23-3-119(f) further clarifies:

> (1) It is the specific intent of the General Assembly . . . to vest in the [APSC] the authority to adjudicate individual disputes between consumers and the public utilities which serve them when those disputes involve public rights which the commission is charged by law to administer.
>
> (2) Public rights which the commission may adjudicate are those arising from the public utility statutes enacted by the General Assembly and the lawful rules, regulations, and orders entered by the commission in the execution of the statutes. The commission's jurisdiction to adjudicate public rights does not and cannot, however, extend to disputes in which the right asserted is a private right found in the common law of contracts, torts, or property.

*Id.* at (f)(1), (2).

To appreciate the contours of the APSC's authority to resolve disputes in pole-attachment cases, two points must be made about the distinction between "public rights" and "private rights" set forth in Ark. Code Ann. § 23-3-119. The first is that the distinction is not dependent on the labels applied to the causes of action in a complaint. In at least four cases, the Arkansas Supreme Court has held that the APSC has primary jurisdiction over claims involving contract or tort causes of action. In *Cullum v. Seagull*

*Mid-South, Inc.*, 322 Ark. 190 (1995), a group of customers brought a class-action lawsuit against a natural gas company alleging the tort of fraud. *Id.* at 193. In determining whether the circuit court properly dismissed the case for lack of subject-matter jurisdiction, the Arkansas Supreme Court framed the question not in terms of how the cause of action was labelled, but instead based on "whether the tort action . . . encroache[d] on the exclusive authority of the [APSC] to fix rates." *Id.* at 196. Finding that it did, the *Cullum* Court adopted the filed-rate doctrine—a doctrine not directly relevant to this motion—and affirmed the dismissal, thus holding that the APSC had primary jurisdiction over the dispute despite the tort cause of action. *Id.* at 197-98.

Eleven years later in *Austin v. Centerpoint Energy Arkla*, 365 Ark. 138 (2005), the Arkansas Supreme Court held that a natural gas customer's "use of the phrases 'replevin,' 'tort,' and 'civil rights,'" did not change the "reality" that her action was "a dispute over rates." *Id.* at 146. Instead, "when a plaintiff's tort action is nothing more than a collateral attack on a utility's rate-making authority, the tort action impermissibly encroaches on the exclusive authority of the [APSC] to fix rates." *Id.* Thus, "the mere labeling of a claim as a tort claim does not automatically deprive the [APSC] of authority to hear the complaint." *Id.*

*Cullum* and *Austin* were heavily relied on in *Centerpoint Energy, Inc. v. Miller County Circuit Court, Second Division*, 370 Ark. 190 (2007). As in *Cullum*, *Centerpoint Energy* involved a class-action suit brought against a natural gas company. The class-action complaint alleged fraud, unjust enrichment, and conspiracy, and specifically argued that "state regulatory agencies do not have the authority to adjudicate private causes of action or tort claims." *Id.* at 194-95. The circuit court agreed with the class

plaintiffs, denying the defendants' motion to dismiss in part because "the APSC did not have the authority to adjudicate claims of common law fraud." *Id.* at 195. The Arkansas Supreme Court reversed. Again declining to rely on the complaint's labelling of the claims in terms of common law tort, the Court looked to the scope of the APSC's authority and the "true nature of the complaint." *Id.* at 202-03. It noted the APSC's exclusive jurisdiction over determining rates for natural gas; found that the plaintiffs' suit was really premised on being charged too much for gas, despite being couched in terms of tort; and declared the case to be "precisely the kind of dispute that should be decided by the APSC." *Id.*

Finally, in *Capps v. Carroll Electric Cooperative Corp.*, 2011 Ark. 48, customers of the electric-company defendant sought a refund of certain capital credits retained by the defendant. The customers argued that their claims involved private contractual rights premised on the defendant's bylaws. *Id.* at *4. Rejecting this contention, the Arkansas Supreme Court held that the "statutes that create and regulate public utilities, specifically the electric-cooperative corporations, address the matter of capital credits." *Id.* at *6. Accordingly, it was "clear that the APSC [had] primary jurisdiction over any claims that [the defendant had] in some way violated the requirements" of the statute, despite the plaintiffs' "repeated attempts to couch the claim as some sort of private right found in the common law of contracts, torts, or property." *Id.* at *7.

To be sure, these cases are distinguishable from the instant case in some important ways. They all involve disputes between utility companies and their customers, not between two utility companies. And, all but *Capps* involved application of the filed-rate doctrine. Nonetheless, the Arkansas Supreme Court's approach to

8

determining whether these cases involved private or public rights is incredibly instructive. They indicate that courts should focus not on the labels applied to the claims in the complaint, but on whether the substance of the claims encroaches on the exclusive authority of the APSC, and on whether Arkansas' statutes and regulations address the subject-matter of the complaint.

The second point that must be made about the distinction between public rights and private rights is that in the specific context of pole-attachment disputes, the APSC does have jurisdiction to resolve cases involving *some* private rights. This is so because Ark. Code Ann. § 23-3-119 must be read in light of the later-enacted Act 740 of 2007. Ark. Laws Act 740 (H.B. 1636) (codified at Ark. Code Ann. § 23-4-1001 *et seq.*); *see Kyle v. State*, 312 Ark. 274, 278 (1993) ("The settled rule of statutory construction is that if two legislative acts relating to the same subject are in conflict with each other, the later act controls."). The purpose of Act 740 was to give the APSC jurisdiction over pole-attachment agreements and disputes among utilities regarding pole attachments. *Id.* The Act states in relevant part:

> (a) The Arkansas Public Service Commission *may* hear and determine all complaints arising from:
>
> (1) A public utility's failure or refusal to provide access for a pole attachment;
>
> (2) The inability of a public utility and an entity seeking access for a pole attachment to reach a voluntarily negotiated, written agreement governing access for the pole attachment; and
>
> (3) Disputes between a public utility and an entity over the implementation of an existing contract granting the entity access for a pole attachment.

Ark. Code Ann. § 1004(a) (emphasis added); *see also* Doc. 24-1, p. 6 (APSC's 2008 Pole Attachment Rules) (enacting a procedure for bringing complaints to the APSC that

includes reference to disputes over written pole-attachment agreements). Importantly, the General Assembly's use of the phrase "may" indicates that the APSC has permissive, but not primary and exclusive, jurisdiction over the enumerated categories of claims.

Viewing the Assembly's grants of jurisdiction to the APSC in Ark. Code Ann. §§ 23-3-119 and 23-4-1004 together, the Court believes the APSC's jurisdiction to resolve pole-attachment disputes can be summarized by reference to three categories of cases.

- First, the APSC has primary and exclusive jurisdiction over such disputes when they involve "public rights," as defined by Ark. Code Ann. § 23-3-119 and elaborated upon by *Cullum*, *Austin*, *Centerpoint Energy*, and *Capps*.

- Second, the APSC has permissive jurisdiction over such disputes when they do not involve "public rights," but do involve "private rights" encompassed by the categories listed in Ark. Code Ann. § 1004(a). That is, the APSC has permissive jurisdiction over disputes involving the refusal to provide access for a pole attachment, the inability to reach agreement over a pole attachment, or the implementation of an existing contract granting access for a pole attachment.

- Third, the APSC has no jurisdiction to resolve such disputes when they involve only "private rights" of the sort not encompassed by Ark. Code Ann. § 1004(a).

Why is it important to identify these jurisdictional categories? Understanding the scope of the APSC's jurisdiction is essential to determining whether the Court's

resolution of this case "would be disruptive of [Arkansas'] efforts to establish a coherent policy with respect to" pole attachments. *New Orleans Pub. Serv., Inc.*, 491 U.S. at 361. Generally speaking, adjudicating claims within the first category—those committed to the primary jurisdiction of the APSC—would reason to create the most disruption; adjudicating claims within the second category—those within the permissive jurisdiction of the APSC—may also create disruption; and adjudicating claims within the third category—those that the APSC has no jurisdiction to resolve—would not cause disruption.

**2.    The APSC's Authority to Promulgate Regulations for Pole Attachments**

Beyond its jurisdiction to resolve disputes related to pole attachments, the scope of the APSC's authority to promulgate regulations related to pole attachments is also relevant to determining whether this Court should abstain from or stay these proceedings. The APSC's regulatory authority for such matters is set forth in Act 740.

> (a) The Arkansas Public Service Commission shall regulate the rates, terms, and conditions upon which a public utility shall provide access for a pole attachment.

> (b) (1) The commission shall develop rules necessary for the effective regulation of the rates, terms, and conditions upon which a public utility shall provide access for a pole attachment. . . .

> (c) Nothing in this section prevents a public utility . . . from entering into a voluntarily negotiated, written agreement regarding the rates, terms, and conditions upon which access for a pole attachment is provided.

Ark. Code Ann. § 23-4-1003. Also relevant is Ark. Code Ann. § 1002, which instructs that "[a] public utility shall provide nondiscriminatory access for a pole attachment" to other utilities.

This statutory scheme highlights three features of Arkansas' public policy respecting pole attachments: First, the APSC has broad rulemaking authority over the rates, terms, and conditions for pole attachments. Second, rules made pursuant to that authority can be circumvented by private agreements. Third, regardless of whatever else the APSC's rules—or private agreements—require, public utilities must provide non-discriminatory access to their poles.

As with the APSC's jurisdiction to resolve pole-attachment disputes, Arkansas' statutory scheme and the APSC's rule-making authority have implications for whether this Court should abstain from or otherwise stay this case. Because utility companies can set their own rates, terms, and conditions by private agreement, construing such agreements will generally be unlikely to disrupt Arkansas' state policy regarding pole attachments. However, in cases requiring the Court to look outside of an agreement to determine what a reasonable rate, term, or condition would be, the potential for disruption is higher. And, when resolving an issue requires the Court to decide whether a utility provided nondiscriminatory access for a pole attachment, the potential for disruption is similarly higher.

### C.    Whether this Court Should Abstain From or Stay These Proceedings

### 1.    The Court Will Abstain From Adjudicating Carroll Electric's Request for Injunctive Relief

In applying the principles articulated in Sections II.B.1 & 2, *supra*, the Court first finds that abstention is proper with respect to Carroll Electric's request for injunctive relief. As a reminder, *Burford* abstention is appropriate:

> (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of

12

> the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc.*, 491 U.S. at 361 (quotations omitted). Dismissal under *Burford*, moreover, is only appropriate where the relief requested is equitable or otherwise discretionary. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728-31 (1996). Injunctive relief is, of course, an equitable remedy.

Simply put, the Court is convinced that ordering SWBT to remove its attachments from Carroll Electric's poles would both (1) involve difficult questions of state law bearing on policy problems of substantial public import, and (2) be incredibly disruptive of Arkansas' efforts to establish a coherent policy related to pole attachments. Regarding the former, even if the Court were to find that SWBT is trespassing on Carroll Electric's poles, Ark. Code Ann. § 23-4-1002's command that utility companies *shall* provide nondiscriminatory access for pole attachments makes the appropriateness of injunctive relief a difficult question of state law. That is, assuming SWBT's attachments were otherwise unauthorized, Carroll Electric still has a statutory duty to provide it with nondiscriminatory access to its poles. What, then, would be the effect of an injunctive order be? Ought the Court to order SWBT to remove its attachments, only for SWBT to then re-establish its legal right to access Carroll Electric's poles by virtue of § 1002? This difficult question of state law, further, bears on problems of substantial public import going far beyond this case. If the Court were to order SWBT to remove its attachments, it would risk leaving thousands of Arkansans without telephone access for an undetermined amount of time. *Accord Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv.*

*Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").

Second, adjudication of the injunction issue would disrupt Arkansas' efforts to establish coherent policy with respect to pole attachments. Some context is useful to appreciate the Court's full concern on this front. Animating much of this case is the APSC's effort to overhaul its regulations related to pole attachments. After Act 740 was passed in 2007 and the General Assembly conferred upon the APSC regulatory power over pole attachments, the APSC enacted its original set of Pole Attachment Rules on June 30, 2008. *See* Doc. 24-1. These rules are relatively bare bones, providing only basic procedural requirements for filing complaints with the APSC. Beginning in early 2015, the APSC initiated its rulemaking process to modify and expand its 2008 Pole Attachment Rules. *See* Doc. 24-2. Specifically, it sought to modify its rules related to: "(a) Rates, terms and conditions for pole attachments . . . including consideration of formula rates . . .; (b) Technical standards for pole attachments . . .; (c) Terms regarding pole replacement, maintenance, reclamation of space and rearrangement; and (d) notice requirements . . . ." *Id.* at 2.

On June 24, 2016—after this suit had been filed and less than a week before SWBT filed the instant Motion—the APSC entered an extensive 170-page order adopting a set of revised pole-attachment rules (the "Revised Rules"). *See* Doc. 23, p. 2; APSC Docket #15-019R, Doc. 62 (available at http://www.apscservices.info/pdf/15/15-019-R_62_1.pdf). The purpose and scope of the Revised Rules are set forth as follows:

> These Rules govern the [APSC's] regulation of the rates, terms, and conditions upon which a Pole Owner shall provide nondiscriminatory

> access for a Pole Attachment in the absence of a voluntarily negotiated agreement. These Rules also govern procedures necessary and appropriate to hear and resolve complaints arising from the failure or refusal to provide access, the inability of a Pole Owner and an entity seeking access for a Pole Attachment to reach a voluntarily negotiated written agreement, and disputes over implementation of an existing contract.

*Id.* at Ex. B, p. 1-2. To those ends, the Revised Rules establish a formula "for determining the maximum just and reasonable rates" when "the parties fail to reach a voluntarily negotiated written agreement" and bring a complaint before the APSC. *Id.* at Ex. B, pp. 1-4; 2-4. And, they allocate responsibility for modifying poles to create additional space for attachments. *Id.* at Ex. B, p. 4-3.

If the Court were to order injunctive relief in this case (and other similar cases) it would be directly interfering with the APSC's attempt to create a uniform and coherent policy with respect to disagreements surrounding pole attachments. The Revised Rules constitute the APSC's attempt to establish a series of reasonable default rates, terms, and conditions to govern utility companies' relationships regarding pole attachments when private agreements break down, or never come to fruition. Ordering one party to remove its attachments from the other's poles is directly *contra* to this intricate regulatory scheme. That scheme contemplates the application of "the maximum just and reasonable rates," as determined by a formula, when pole attachments are not otherwise governed by a private agreement. *Id.* at Ex. B, p. 1-4. The Revised Rules also contemplate requiring a party who needs additional space to bear the cost of installing a

taller pole. *Id.* at Ex. B, p. 4-3. Granting injunctive relief and requiring the removal of attachments, rather than the expansion of poles, undermines that preferred remedy.[2]

Additionally, granting injunctive relief would interfere with the APSC's attempt to create a uniform and coherent policy because the issue involves public rights and, therefore, falls within the primary jurisdiction of the APSC. As the Court discussed in Section II.B.1, *supra*, whether a right is "public" or "private" depends on whether the substance of the claim encroaches on the exclusive authority of the APSC, and on whether Arkansas' statutes and regulations address the subject-matter of the claim. The substance of Carroll Electric's request for injunctive relief is that SWBT has no legal right to remain attached to its poles, and so SWBT must remove its attachments. To determine whether SWBT has a legal right to attach to Carroll Electric's poles, the Court would have to interpret and apply Ark. Code Ann. § 23-4-1002, which requires utility companies to "provide nondiscriminatory access for a pole attachment" to other utility companies. Since a statute, and not a contract or private wrong, would determine whether SWBT should have to remove its attachments from Carroll Electric's poles, the right to injunctive relief complained of by Carroll Electric is public.

For these reasons, *Burford* abstention is appropriate with respect to Carroll Electric's request for injunctive relief.

---

[2] To be sure, the Revised Rules have a long way to go before they are enacted into law. They are subject to revision within the APSC, and must also be approved by the Arkansas Legislative Council and the Governor. *Id.* at 169. But what is important for the purposes of *Burford* abstention is that the Rules reflect the state's *efforts* to establish a coherent policy for what is, undoubtedly, a matter of substantial public concern.

### 2.     The Court Will Stay Proceedings With Respect to Carroll Electric's Trespass Claim

Carroll Electric's trespass claim is already dismissed to the extent that it is tied to its request for an injunction, but the Amended Complaint also requests damages related to SWBT's alleged trespass. *See* Doc. 22, ¶ 15. "Arkansas's law of trespass requires a physical invasion of a plaintiff's real property that is caused by a defendant and results in damages." *Cross v. W. Waste Indus.*, 2015 Ark. App. 476, at *6 (citing *Jewel Coal & Mining Co. v. Watson,* 176 Ark. 108 (1928)).[3] Implicit within the definition of trespass is that the invasion of property be unauthorized. *E.g.*, *Passmore v. Hinchey*, 2010 Ark. App. 581 (describing an alleged intentional trespass as one involving "notice from the landowner that [the defendant's] use of the property was unauthorized"); Restatement (Second) of Torts § 160 (defining a "failure to remove" trespass as occurring after "consent has been effectively terminated" or after a "privilege has been terminated").

In order to determine whether SWBT's attachments to Carroll Electric's poles are unauthorized, the Court would have to interpret and apply Ark. Code Ann. § 23-4-1002, just as it would have to do in the aforementioned injunction context.[4] This makes Carroll Electric's trespass claim one falling under the category of "public rights," and within the

---

[3] The issue of whether a trespass must result in damages, though not important to adjudication of the instant Motion, may not be as clear cut as the *Cross* Court seems to suggest. *See* Howard W. Brill, 1 Arkansas Law of Damages § 30:6 (5th ed. 2004) (stating that under common law a trespass occurs regardless of "the absence of damage to the land").

[4] To be perfectly clear, the fact that the Court must interpret and apply a state statute, in and of itself, is not a justification for abstaining or staying any proceedings. The application of state law in this case is relevant to the abstention / stay inquiry only because it makes the trespass claim one involving "public rights" under Arkansas law. Since such claims are committed to the primary jurisdiction of the APSC as part of a complex regulatory scheme, the Court's adjudication of the claim would interfere with that scheme. This is especially so while the APSC is in the process of making substantial changes to its regulations.

primary jurisdiction of the APSC. Were the Court to assess damages for SWBT's alleged trespass—and do so in similar cases—it would greatly undermine Arkansas' efforts to create a coherent regulatory scheme. One of the fundamental purposes of the APSC's Revised Rules is to establish reasonable rates to assess liability in situations where attachments are maintained outside the context of a voluntarily negotiated agreement. The Revised Rules accomplish this by applying a set formula to determine what rates are just and reasonable. Were the Court to award damages for trespass based on some other metric before the Revised Rules are enacted, the utility companies to whom the metric was more favorable than the proposed formula in the Revised Rules would rush to this Court in an effort to get their liability or damages assessed at the preferable rate. This would, no doubt, completely undermine the APSC's efforts in carefully prescribing reasonable rates.

Because Carroll Electric's request for damages based on trespass falls under the category of public rights, and because awarding damages based on a trespass theory would undermine Arkansas' efforts to craft a coherent regulatory scheme regarding attachments without agreements, the Court will stay proceedings regarding Carroll Electric's trespass claim. This stay will remain in effect until the APSC's Revised Rules are enacted into law, at which point the parties can move the Court to lift the stay. If Carroll Electric would like to have its trespass claim adjudicated in the interim, the Court encourages it to file a complaint with the APSC.[5]

---

[5] Given the Court's determination that Carroll Electric's trespass claim is a public rights claim, and thus within the primary jurisdiction of the APSC, the Court is also concerned about the potential for forum shopping presented by this case, should it eventually reach the merits. Were the claim brought in state court, it would be dismissed and the parties would be directed to the APSC to resolve their dispute. In federal court, because the

### 3.     The Court Will Not Stay Proceedings With Respect to Carroll Electric's Breach of Contract Claim

Arkansas' regulatory scheme for pole attachments is not intended to "prevent[] a public utility . . . from entering into a voluntarily negotiated, written agreement regarding rates, terms, and conditions upon which access for a pole attachment is provided." Ark. Code. Ann. § 23-4-1003. Relatedly, the APSC's jurisdiction to adjudicate disputes over pole-attachment agreements is permissive, not primary and exclusive. Ark. Code Ann. § 1004(a). It follows that interpreting and applying such agreements would not necessarily involve difficult questions of state law of substantial public importance, or disrupt Arkansas' efforts to establish coherent policy. Indeed, because it explicitly authorizes private agreements and grants the APSC only permissive jurisdiction over them, Arkansas' regulatory scheme implicitly contemplates the interpretation and application of privately negotiated pole-attachment agreements by the courts.

That is not to say, however, that a breach of contract claim in a pole-attachment dispute can never require a stay to avoid undue interference with state regulatory processes. In the instant case, for example, if the Court is eventually asked to assess damages or liability based on the determination of a reasonable rate, rather than a rate specified in the JUA, a stay may be appropriate. But, these proceedings are still in a relatively early stage, and the Court is mostly in the dark about the details of Carroll Electric's breach of contract claim. The Court accordingly does not believe a stay is appropriate at this time.

---

claim is one for damages, the Court cannot just decline to exercise its jurisdiction in favor of the APSC's—at least not on the instant Motion. Thus, litigants who want to avoid the APSC and instead have their disputes resolved by a court will select federal courts over state courts.

Finally, SWBT avers in its Brief in Support (Doc. 24) that Carroll Electric's breach of contract claims fall outside the applicable statute of limitations. (Doc. 24, pp. 4, 6). The Court views these passing references as insufficient to raise the statute of limitations issue. Thus, it will not reach that question herein.

### III.    CONCLUSION

For the reasons stated above, SWBT's Motion to Dismiss, Abstain, or in the Alternative, Stay (Doc. 23) is **GRANTED IN PART** and **DENIED IN PART** as follows:

- To the extent that the Motion asks the Court to dismiss the case for lack of subject-matter jurisdiction, it is **DENIED**.

- As to Carroll Electric's request for injunctive relief, SWBT's request for the Court to abstain is **GRANTED**, and Count II of the Amended Complaint (Doc. 22) is **DISMISSED WITHOUT PREJUDICE**.

- As to Carroll Electric's trespass cause of action, SWBT's request for the Court to stay proceedings is **GRANTED**, and all proceedings related to Count I of the Amended Complaint (Doc. 22) are hereby **STAYED**. The stay shall remain in effect until the earlier of: (i) the APSC's Revised Rules are enacted into law and the Court grants a motion to lift the stay; (ii) the APSC abandons the rulemaking process for its Revised Rules and the Court grants a motion to lift the stay; or (iii) *sua sponte* at any time, or upon motion filed not sooner than one year from the entry of this Order, the Court finds that undue delay in the APSC's rulemaking process justifies lifting the stay. Throughout the duration of the stay, the parties shall jointly submit a filing updating the Court on the status of the Revised Rules every 90 days.

- As to Carroll Electric's breach of contract cause of action, and the punitive damages count associated with it, SWBT's Motion is **DENIED**.[6] SWBT is permitted to move for a stay at a later date, in accordance with Section II.C.3, *supra*.

---

[6] SWBT does not raise the issue of whether a party can recover punitive damages for a breach of contract under Arkansas law. Therefore, the Court's denial of SWBT's Motion to Dismiss, Abstain, or Stay with respect to Carroll Electric's Count IV (Punitive Damages), insofar as that count applies to its breach of contract claim, should not be interpreted as deciding that issue.

**IT IS SO ORDERED** on this ____ day of September, 2016.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE